UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**KYONG BARRY**, et al.

        Plaintiffs,

        v.

**UNITED FOOD AND COMMERCIAL WORKERS**, et al.

        Defendants.

Case No. 1:24-cv-01137 (TNM)

**MEMORANDUM OPINION**

Members of the United Food and Commercial Workers (UFCW) union bring suit under the Labor Management Reporting Disclosure Act (LMRDA), alleging infringements to their rights to an equal vote and free expression. The UFCW moves to dismiss, insisting that the Court lacks subject matter jurisdiction over the claims. The UFCW alternatively posits that the union members have failed to state a claim for which relief can be granted.

The Court will dismiss the Complaint. For all but one claim, Plaintiffs lack standing. And for various allegations, relief is foreclosed by Title IV of the LMRDA. As for the one jurisdictionally proper challenge, Plaintiffs have failed to state a plausible claim for relief.

**I.**

Plaintiffs Kyong Barry and Iris Scott are rank-and-file members of the national union United Food and Commercial Workers (UFCW). Compl., ECF No. 1, ¶ 1. They have qualms about how decisions are made. *See generally id.* They think that individual members lack "equal" voting power to select delegates for the quinquennial Convention, "the highest governing body of the UFCW." *Id.* ¶ 12. According to Barry and Scott, members of both "the largest and smallest" local chapters are deprived of proportional representation. *Id.* ¶ 1. This

result allegedly violates the Labor Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. § 411(a)(1), which provides that "[e]very member of a labor organization shall have equal rights and privileges within such organization to nominate candidates [and] to vote in elections . . . subject to reasonable rules and regulations in such organization's constitutions and bylaws."

Their theory rests on the following facts. The Convention consists of delegates from the hundreds of local chapters that make up the UFCW. Compl. ¶ 13. As set out in the union's Constitution, the number of representatives per local depends on the size of that local. *Id* ¶ 16. But Barry and Scott complain that "delegates are not apportioned on the basis of 'one person, one vote' or in a manner that assures the members of the UFCW have an equal right to elect and be represented by delegates at the UFCW Conventions." *Id.* ¶ 17. Instead, delegates are meted out on a sliding scale, such that larger locals have fewer delegates per member than do smaller locals. *Id.* ¶¶ 17–19. As set out in the UFCW Constitution, the allocation is as follows:

| **Number of Active Members in Local Union** | **Number of Delegates** |
|---|---|
| 1 – 500 | 1 |
| 501 – 1,000 | 2 |
| 1,001 – 1,750 | 3 |
| 1,751 – 2,500 | 4 |
| 2,501 – 3,250 | 5 |
| 3,251 – 4,000 | 6 |
| 4,001 – 4,750 | 7 |
| 4,751 – 5,500 | 8 |
| 5,501 – 6,250 | 9 |
| 6,251 – 7,000 | 10 |
| 7,001 – 7,750 | 11 |
| 7,751 – 8,500 | 12 |
| 8,501 – 9,250 | 13 |
| 9,251 – 10,000 | 14 |
| 10,001 – 10,750 | 15 |
| 10,751 – 11,500 | 16 |
| 11,501 – 12,250 | 17 |
| 12,251 – 13,000 | 18 |
| 13,001 – 13,750 | 19 |
| 13,751 – 14,500 | 20 |
| 14,501 – 16,000 | 21 |
| 16,001- 18,000 | 22 |
| 18,001 – 21,000 | 23 |

| | |
|---|---|
| 21,001 – 24,000 | 24 |
| 24,001 – 29,000 | 25 |
| 29,001 – 34,000 | 26 |
| 34,001 – 39,000 | 27 |
| 39,001 – 44,000 | 28 |
| 44,001 – 49,000 | 29 |

UFCW Const., ECF No. 15-1, Art. 15(B).

When a local grows past 49,000 members, it is given another delegate for each additional 5,000 members. Compl. ¶ 16. Barry and Scott argue that this distorts Convention representation. They point out that "[w]hile the first delegate apportioned to a local never represents more than 500 members, the final delegates apportioned to the largest locals represent 5,000 members." *Id.* ¶ 21. So "members in smaller locals have voting power, at the Convention, far greater than members of larger locals." *Id.* ¶ 22.

The delegate apportionment scheme is not the only problem Barry and Scott have with the UFCW Constitution. They argue that another feature unfairly penalizes smaller locals—the provision that automatically elevates the president and secretary of each local to Convention delegates. *Id.* ¶¶ 24–27. These officers are chosen in local elections every three years separate from delegate elections. *Id.* ¶ 25. Barry and Scott argue that "[t]he qualities and relevant political issues members might judge a candidate for local union office as to matters involved in managing the local are entirely distinct from those on which members might judge a candidate for national convention delegate, voting on national union policy." *Id.* ¶ 29. So in the smallest locals, Barry and Scott allege that "there is no election for delegates at all." *Id.* ¶ 27. And "[i]n other cases . . . while there may be an election for delegates, the number of available delegate positions is artificially reduced because the president and secretary treasurer of each local are *ex officio* delegates." *Id.* This, they assert, also infringes on the right to an equal vote.

Along with the constitutional provisions regulating delegate elections, Barry and Scott object to several practices by locals that allegedly violate their rights. They insist that *ex officio*

3

delegates in many locals refuse to send "rank-and-file delegates" to the convention, citing financial reasons as a pretextual justification to increase their own influence. *Id.* ¶¶ 33–34. And they contend that certain locals fail to adequately publicize delegate elections, burying notices "in small type on the back pages of a union newsletter that few members thoroughly read." *Id.* ¶ 42. Both practices are purportedly condoned by the UFCW. *Id.* ¶ 34. These chapter-specific practices, according to Barry and Scott, deprive various members of an equal right to vote as guaranteed by the LMRDA.

Finally, Barry and Scott claim that all the forementioned violations violate their rights under the LMRDA "to express any views, arguments, or opinions" and "to express at meetings of the labor organization [their] views, upon candidates in an election of the labor organization." 29 U.S.C. § 411(a)(2). They allege that "the UFCW has maintained a system that seeks to limit opportunities for debate within local unions and at local meetings," which has had the "effect of preventing the robust political debate that the holding of the Convention should occasion, and in some cases, eliminates any debate at all." Compl. ¶ 63.

Barry and Scott want to fix things before the next Convention in 2028. *See id.* ¶ 13. So they bring this suit against the UFCW, its president, and its secretary treasurer (collectively, UFCW). *Id.* ¶¶ 7–9. They assert violations of the LMRDA and seek injunctive relief "to conform the UFCW Constitution and voting rules prospectively" to comply with the statute. *Id.* ¶¶ 50, 54. They also seek nominal damages. *Id.* at 14.

The UFCW moves to dismiss. Def.'s Mot. Dismiss, ECF No. 12. It argues mainly that dismissal is proper under Federal Rule of Civil Procedure 12(b)(1) because the Court lacks subject matter jurisdiction. *Id.* at 8–19. Alternatively, it posits that dismissal is warranted under

4

Rule 12(b)(6) because Barry and Scott fail to state a claim upon which relief can be granted. *Id.* at 19–36. The motion is now ripe for the Court's consideration.

## II.

### A.

The Labor Management Reporting and Disclosure Act (LMRDA) safeguards the "full and active participation by the rank and file in the affairs of the union." *American Fed'n of Musicians v. Wittstein*, 379 U.S. 171, 182–83 (1964). Title I of the Act sets forth a bill of rights for union members, which aims "to assure to union members a basically democratic union organization with the concomitant protections against arbitrary and despotic control by union leaders." *Schuchardt v. Millwrights and Mach. Erectors Loc. Union No. 2834*, 380 F.2d 795, 797 (10th Cir. 1967); 29 U.S.C. §§ 401–403. It also provides a private right of action for union members to enforce their rights against labor organizations in federal court. 29 U.S.C. § 412.

Still, the LMRDA does not give a court *carte blanche* to meddle in a union's internal affairs and elections. *Shelley v. Am. Postal Workers Union*, 775 F. Supp. 2d 197, 207 (D.D.C. 2011). Title IV of the Act "regulates the conduct of elections for union officers, and therefore protects many of the same rights as does Title I." *Loc. No. 82, Furniture & Piano Moving, Furniture Store Drivers, Helpers, Warehousemen & Packers v. Crowley*, 467 U.S. 526, 539 (1984); 29 U.S.C. §§ 481–483. But this Title "contains its own comprehensive administrative and judicial procedure for enforcing [its] standards." *Crowley*, 467 U.S. at 539. A union member must exhaust internal remedies, then file a complaint with the Secretary of Labor. 29 U.S.C. § 482. And that procedure is "exclusive." *Crowley*, 467 U.S. at 540. Meaning that while federal courts have subject matter jurisdiction over Title I claims, they lack jurisdiction over

Title IV claims brought by individuals. Only the Secretary of Labor can pursue Title IV actions in federal court. 29 U.S.C. § 482.

This can be confusing, as "[t]he statutory rights contained within Title I and Title IV can sometimes seem to overlap." *Conille v. Council 93, Am. Fed'n of State, Cnty. & Mun. Emps.*, 973 F.3d 1, 9 (1st Cir. 2020). So it is "hardly surprising that the line between a Title I and a Title IV violation is muddy." *Id.* Still, a good rule of thumb (with some exceptions) is temporal. That is, "Title IV plainly bars Title I relief when an individual union member challenges the validity of an election *that has already been completed*." *Crowley*, 467 U.S. at 541 (emphasis added). But if a member is challenging an election that has yet to occur, generally that claim will fall under the auspices of Title I. *But see id.* (discussing exceptions).

**B.**

Federal Rule of Civil Procedure 12(b)(1) governs dismissal of a complaint for lack of subject matter jurisdiction. The burden is on the plaintiff to establish jurisdiction. *Johnson v. Becerra*, 668 F. Supp. 3d 14, 19 (D.D.C. 2023), *aff'd*, 111 F.4th 1237 (D.C. Cir. 2024). While the Court accepts all the factual assertions in the Complaint as true, "those allegations will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Nepal v. U.S. Dep't of State*, 602 F. Supp. 3d 115, 123 (D.D.C. 2022) (cleaned up). For standing at the pleading stage, a plaintiff must offer "general factual allegations of injury resulting from the defendant's conduct." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

To survive a 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). This means that the factual allegations "must be enough to

raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). And "courts are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 555.

### III.

### A.

For all but one claim, the Court lacks jurisdiction.

The judicial power of the federal courts only extends so far. Article III of the Constitution limits their authority to the disposition of "Cases" and "Controversies." U.S. Const. Art. III. And "[f]or there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case—in other words, standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). That boils down to three ingredients. First, the plaintiff must show he suffered an injury in fact—"an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (cleaned up). Second, the plaintiff must show causation—that is, "the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* Third, it must be likely that the harm "will be redressed by a favorable decision." *Id.* at 561 (cleaned up). Otherwise, a plaintiff may not invoke the limited jurisdiction of a federal court.

Start with Barry and Scott's scruples about the delegate apportionment scheme. They broadly claim that the "extreme departure from equal proportional representation increases as the size of the local increases, so that members in smaller locals have an effective weighted vote greater than the vote of members in the larger locals." Compl. ¶ 19. As a result, the UFCW allegedly "den[ies] members like Plaintiffs Kyong Barry and Iris Scott . . . of their equal right to

7

vote by failing to extend an equal right to vote to every member in every local." Compl. ¶ 48. So Barry and Scott "suffer from the denial of [voting] rights to other members." Compl. ¶ 4. They thus seek to prospectively alter the algorithm. Compl. ¶ 50.

For starters, the Court assumes that Barry and Scott have pled a concrete injury. Concreteness queries "whether the alleged injury to the plaintiff has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 424 (cleaned up). And if Congress decides to divvy out rights and obligations, that choice is "instructive" to the concreteness question. *Id.* at 425. But the legislature's choice to create a statutory entitlement does not automatically translate to a concrete harm. *Id.* at 426–30. It is still a court's job to discern whether the injury pled is one that fits comfortably within the history and tradition of Article III. *Id.*

That test is satisfied here. There is a long basis of federal courts hearing claims of voter dilution. *See Baker v. Carr*, 369 U.S. 186, 206 (1962). Sure, the bulk of these cases were constitutional, and the Supreme Court has acknowledged that many traditional intangible harms come from the Constitution itself. *TransUnion*, 594 U.S. at 425. But "an exact duplicate in American history and tradition" is unnecessary, only a "close relationship" or "analogue." *Id.* at 424.

That much is present here. Thus, the harm asserted in the constitutional voter dilution cases provides a ready analogy for the harm asserted under the LMRDA. *See Conille*, 973 F.3d at 13. And that harm has been recognized as a concrete injury in federal courts. *See Gill v. Whitford*, 585 U.S. 48, 66 (2018); *Baker*, 369 U.S. at 206–07; *Rucho v. Common Cause*, 588 U.S. 684, 709 (2019) ("'[V]ote dilution' in the one-person, one-vote cases refers to the idea that each vote must carry equal weight.").

Still, Barry and Scott's broad allegation that UFCW "fail[s] to extend an equal right to vote to every member in every local" does not suffice to show a particularized injury. Compl. ¶ 48. The right to vote "is individual and personal in nature." *Gill*, 585 U.S. at 65. So only those voters "who allege facts showing disadvantage to themselves *as individuals* have standing to sue." *Baker*, 369 U.S. at 206 (emphasis added). A plaintiff who alleges a grievance with a voting scheme writ large has not pled a particularized injury. *United States v. Hays*, 515 U.S. 737, 745 (1995). Nor has one who has shown diminution of someone else's vote. *Gill*, 585 U.S. at 66. Instead, a plaintiff must demonstrate that "the rights allegedly impaired are individual and personal in nature." *Reynolds v. Sims*, 377 U.S. 533, 561 (1964). He must "seek relief in order to protect or vindicate an interest of [his] own." *Baker*, 369 U.S. at 207. So Barry and Scott's sweeping allusions to their fellow laborers' rights are insufficient; they need to demonstrate that their *own* votes have been hampered by the delegate apportionment scheme.

The problem is, Barry and Scott do not show their work. They never indicate their respective voting power, or its relative devaluation compared to members in other locals. So they have not shown that they have personally suffered harm from the apportionment algorithm. Instead, they summarily insist that "Barry is in a large local which has an unlawful and unreasonable cap on the number of delegates to be elected." Compl. ¶ 4. But recall that the Court only accepts a plaintiff's factual assertions as true—not his legal conclusions. *Sandpiper Residents Ass'n v. U.S. Dep't of Hous. & Urb. Dev.*, 106 F.4th 1134, 1143 (D.C. Cir. 2024). When the Court strips away Barry's conclusory modifiers—"unlawful and unreasonable"—it is not left with any facts to determine whether his voting power has actually been diminished compared to members of other locals. And while "vote dilution can be a basis for standing . . . it requires a point of comparison." *Wood v. Raffensperger*, 981 F.3d 1307, 1314 (11th Cir. 2020).

Barry and Scott have not offered that here. *Compare Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1248 (11th Cir. 2020) (statistics showing average measures of voter dilution could not prove plaintiff's own vote was diluted).

True, theoretically, any local with a membership greater than 2,501 has a representation ratio greater than 500 to 1. *See* UFC Const. Art. 15(B). So members in any local of this size have reduced voting power compared to members in a local with 500 members. And the math gets worse when one starts to factor in unions with fewer than 500 members, whose voting power will be disproportionately even greater.

But still, the Court's cursory, sua sponte arithmetic will not suffice for the standing question. Too many questions remain to render it plausible that Barry's own voting power is comparatively weak. For one, what constitutes a "large local," which Barry claims to call home? Compl. ¶ 4. Without that information, it is impossible to determine his electoral power and the extent of its alleged diminution. *Cf. Donald J. Trump for President, Inc. v. Boockvar*, 493 F. Supp. 3d 331, 379 (W.D. Pa. 2020) ("A plaintiff can have standing to bring a vote-dilution claim—typically, in a malapportionment case—by putting forth statistical evidence and computer simulations of dilution."). Just as important, what is the smallest local that factually exists? Are there even any one- or two-delegate locals? Deprived of such context, it is impossible for the Court to draw the comparison that is the crux of this case: the actual voting disparity between Barry's local and the most favored local. Without hard numbers, the Court is left with mere speculation.[1] But suppositions cannot transgress jurisdictional bounds. *United Transp. Union v. I.C.C.*, 891 F.2d 908, 915 (D.C. Cir. 1989).

---

[1] Barry and Scott gesture towards the size of their locals in an exhibit, Local LM-2s, ECF No. 15-2. But it lacks context. The Court would have to jump to conclusions to give it any meaning. The Court is wary to do so when dealing with the nebulous "irreducible constitutional minimum of standing." *Lujan*, 504 U.S. at 560. More, judges need not "fish a gold coin from a bucket of mud," "not only because the rules of procedure place the burden on the

More, Barry and Scott have failed to show that the alleged harm resulting from the apportionment scheme is "imminent," rather than "conjectural or hypothetical." *Lujan*, 504 U.S. at 560. Recall that they are not seeking retroactive relief to remedy past harm wrought by the apportionment allocation. Instead, they are trying to prevent the same algorithm from controlling the selection of delegates for the 2028 convention. So they are asserting that the apportionment scheme will harm them down the road—three years from now at the earliest, when elections will commence. Defs.' Mot. Dismiss at 11.

Allegations of future harm suffice for standing purposes "if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (cleaned up). But "an alleged injury cannot support standing if it is based primarily on conjecture about future actions and responses." *Peterson v. Transp. Workers Union*, 75 F. Supp. 3d 131, 136 (D.D.C. 2014). Barry and Scott's theory of voter dilution rests on the premise that Barry is in a "large local," and "larger locals" are harmed by the delegate apportionment scheme. Compl. ¶ 4, 5. So the injury necessarily depends on the size of Barry's local. But local membership is constantly in flux. Per Barry and Scott's own briefing, "[b]etween the 2018 convention and the 2023 convention, Plaintiff Scott's local shrunk by 9%, while Plaintiff Barry's grew by 23%." Pls.' Opp'n Br. at 5. So it is plausible that Barry's alleged voter dilution could disappear in the next three years. His local could break up into multiple smaller chapters, or dramatically dwindle in size. Or he could switch locals in the interim.

---

litigants, but also because their time is scarce." *U.S. ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003); *Nw. Nat'l Ins. Co. v. Baltes*, 15 F.3d 660, 662-63 (7th Cir. 1994). At any rate, the isolated data cannot solve the imminence problems with the delegate apportionment claim, as discussed below.

11

Sure, this last go-round, the locals shifted the direction that allegedly exacerbated Barry's injury. But Plaintiffs offer no plausible assertion that this trend will not reverse over the next three years, given the documented instability of local membership. And because a voter dilution theory of standing necessarily depends on claims of relative electoral power, the Court must have reliable numbers to adequately gauge the extent and existence of the harm. Barry and Scott have failed to plausibly allege that their numbers—whatever those may be—are stable enough such that they will suffer their alleged injuries in the future. Indeed, their claims undermine reliability. In sum, then, they lack standing for their delegate apportionment claim.

Next consider Barry and Scott's claims about local practices that they insist hamper their right to an equal vote. They allege that "[t]he UFCW unlawfully permits its local union officers not to hold elections for all the delegates allotted to their locals or to refuse or fail to send elected delegates." Compl. ¶ 55. And they maintain that "the UFCW has no uniform practice from local to local to ensure that members are equally well informed of their rights under the LMRDA and the right of rank-and-file members to run for delegates." Compl. ¶ 58. Finally, they posit that "in violation of the right of members to an informed vote . . . the UFCW provides no information as to the issues that may be considered at such Conventions, including actions upon dues and procedures for the [] election of officers at the Convention." Compl. ¶ 60. The Court lacks jurisdiction over these claims for a few reasons.

*First*, for these claims, Barry and Scott have not disavowed relief for past elections. Instead, in their prayer, they seek nominal damages. Compl. at 14. This backward-looking relief runs headlong into Title IV of the LMRDA, which "sets up a statutory scheme governing the election of union officers," and "attempt[s] to guarantee fair union elections in which all the members are allowed to participate." *Calhoon v. Harvey*, 379 U.S. 134, 140 (1964). Barry and

Scott challenge elections that have come and gone.  But Tile IV "plainly bars Title I relief when an individual union member challenges the validity of an election *that has already been completed.*"  *Crowley*, 467 U.S. at 541 (emphasis added).  Thus Title IV of the LMRDA divests the Court of subject matter jurisdiction over these retrospective claims.

*Second*, Barry and Scott lack standing to bring these allegations.  They have failed to claim they are members of locals that engage in the verboten behavior.  Instead, they acknowledge that there is "variation from local to local" and that the chapters lack a "uniform practice."  Compl. ¶¶ 57, 58.  So it is plausible that Barry and Scott have not and will not suffer these harms at all.

More, these injuries are not "fairly traceable" to the UFCW.  *Lujan*, 504 U.S. at 560 (cleaned up).  Instead, they are "the result of the independent action of [] third part[ies] not before the court"—the misbehaving locals.  *Id.* (cleaned up).  Barry and Scott posit that the UFCW is "responsible" for the alleged asymmetry in local conduct.  Compl. ¶ 57.  But an international union is only responsible for the actions of its locals when it "authorized or ratified" them.  *Berger v. Iron Workers Reinforced Rodmen Loc. 201*, 843 F.2d 1395, 1427 (D.C. Cir.), *on reh'g*, 852 F.2d 619 (D.C. Cir. 1988) (applying common law agency principles to suits against unions under the LMRDA); *Phelan v. Loc. 305 of United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Indus. of U.S. & Canada*, 973 F.2d 1050, 1062 (2d Cir. 1992) (holding common law agency standards govern "union democracy claims under the LMRDA.").  So Plaintiffs must adduce plausible evidence that the UFCW "instigated, supported, ratified or encouraged" the complained-of local conduct.  *Berger*, 843 F.2d at 1427.  But they offer mere conclusory assertions that the UFCW "condones" the practices.  Compl. ¶ 33.

Meanwhile, the UFCW Constitution suggests the opposite, prohibiting the ability of a local to "elect fewer than its quota of delegates" unless the whole chapter approves. UFCW Const. Art. 15(K); *see also* UFCW Const. Art. 15(M) (providing the UFCW "shall pay for the reasonable and necessary cost of transportation of the duly elected delegates"). The Constitution also mandates that locals mail notices to each member before delegate elections that "set[] forth the times, dates, and places" for the elections. UFCW Const. Art. 15(F). Thus, there is no plausible allegation that the UFCW has authorized, ratified, or otherwise approved the alleged misdeeds by its locals.[2] In sum, then, Barry and Scott have no skin in the game for these claims. And they have not adequately pled that the asserted harms are fairly traceable to the UFCW. They accordingly lack standing for the allegations focused on locals. *Compare Baird v. Holway*, 539 F. Supp. 2d 79, 93 (D.D.C. 2008).

Moving to the last claim, Barry and Scott bring a penumbral allegation. They allege that the UFCW "has maintained a system that steadily reduces the number of Convention delegates who would be otherwise elected under one member one vote"; "maintains *ex officio* representation that eliminates all or nearly all elections for delegates in smaller locals"; "allows locals to cancel elections altogether for vague financial reasons"; and "otherwise seeks to limit debate and expression of views that might take place . . . if such elections were held." Compl. ¶ 62. As a result, members cannot express their "views, arguments, or opinions" on candidates in delegate elections, in violation of the LMRDA. 29 U.S.C. § 411(a)(2).

This claim fails for the reasons already discussed. The omnibus claim is expressly backwards looking. It explicitly speaks in the past tense, alleging that the system "has had the

---

[2] As far as Plaintiffs assert the UFCW itself violated their right to an informed vote by "provid[ing] no information as to the issues that may be considered at such Conventions," Compl. ¶ 60, they have still failed to assert they individually were deprived of salient information. So they lack standing for this subclaim because they have not adequately alleged particular harm.

14

intent and effect of preventing the robust political debate that the holding of the Convention should occasion, and in some cases, eliminates any debate at all." Compl. ¶ 13. Barry and Scott do not disclaim relief for prior Conventions for this claim. Indeed, they request damages for it. But Title IV provides that its methods for "challenging an election already conducted shall be exclusive." 29 U.S.C. § 483. It therefore bars subject matter jurisdiction over this allegation.

More, Barry and Scott lack standing for this claim. They fail to allege that their own voices have been silenced on any occasion. Instead, they claim that the UFCW has "unreasonably restrict[ed] the opportunity of rank-and-file members to exercise th[eir] right." Compl. ¶ 61. These generalized assertions are not enough to demonstrate that Barry and Scott themselves have suffered harm. Instead, Barry and Scott merely demand "the right possessed by every citizen to require that the government be administered according to law." *Baker*, 369 U.S. at 208 (cleaned up). Such claims are misplaced in the branch cabined to resolving discrete cases and controversies. Federal courts do not exist to vindicate non-parties' rights.

## B.

Now, Barry and Scott's claim about the *ex officio* delegates. They maintain that "by requiring the local union president and secretary treasurer in each UFCW local to serve *ex officio* as delegates, without being elected separately to such position, the UFCW deprives all members of an equal and effective right to vote." Compl. ¶ 51. And "[t]he use of *ex officio* delegates also has a disparate impact on the equal right of members to vote and run for office," as smaller locals are harmed in a manner disproportionately greater than larger locals. Compl. ¶ 52. This allegedly impacts Scott in a particular way, as she "is in a small local in which *ex officio* appointment of the president and secretary treasurer as delegates leaves a smaller fraction of the

15

delegation up for election." Compl. ¶ 4. Barry and Scott seek to stop this practice in the future, expressly disclaiming a challenge to any election already conducted. Compl. ¶ 54.

Barry and Scott have pled a concrete and particularized harm here. Again, they are asserting an injury to voting power, a harm long recognized as providing a basis for lawsuits in federal courts. *See Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 666 (1966). But this claim is different from a voter *dilution* theory, which undergirded the challenge to the delegate allocation. A voter dilution theory asserts that an algorithm determining representation is unfairly devised, such that certain individuals' votes carry more weight than others. It necessarily rests on comparison. The *ex officio* allegation is different. It is a claim that an external impediment is reducing members' ability to have their votes count. That harm does not require others' votes to count more for it to be real. This distinction is key for the particularity analysis. The harm of the *ex officio* provision is particular to each plaintiff because they each purportedly have their individual voting power reduced by the requirement.

It is of no consequence that every member of the union is subject to the same rule. Harms can be particularized even if shared by a large group of people. *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 24 (1998) ("[W]here large numbers of voters suffer interference with voting rights" the harm can be particularized). Far-reaching is not necessarily antagonistic to individualized. Because the ability of every UFCW member to specifically choose her delegates is ostensibly hampered by the *ex officio* rule, every member suffers a particularized harm because of it. Thus this harm, unlike the challenge to delegate apportionment, is concrete and particularized.

More, "there is a substantial risk that th[is] harm will occur." *Susan B. Anthony List*, 573 U.S. at 158 (2014). Barry and Scott point out that it is virtually certain the *ex officio* rule will be

16

in place for the next convention, as the UFCW Constitution "can be amended only by a two-thirds vote at a duly constituted Convention of the International Union." UFCW Const. Art. 39(A). So "the one thing that could prevent the injury alleged from occurring, the convening of a Convention to amend the language, would cause the injury to occur sooner, since convening a Convention would inflict the injury." Pls.' Opp'n Br. at 4.

Rounding out the standing inquiry, the harm allegedly inflicted by the *ex officio* rule is fairly traceable to the UFCW, as it stems from an explicit provision in the Union's Constitution. And it would be redressed by a favorable court decision, as constitutional language found to clash with Title I of the LMRDA is "of no force or effect." 29 U.S.C. § 411(b). So Barry and Scott have adequately pled standing for the *ex officio* delegate claim.

Even still, Barry and Scott have failed to state a claim for relief here. The text of the statute is clear: members shall have the "*equal* right[] . . . to vote in elections." 29 U.S.C. § 411(a)(1) (emphasis added). This language "is no more than a command that members and classes of members shall not be discriminated against." *Calhoon*, 379 U.S. at 139. So the provision does not call for a particular election structure but rather "mandate[s] that rights given to some members be available to all." *Am. Postal Workers Union Loc. 6885 v. Am. Postal Workers Union*, 665 F.2d 1096, 1101 (D.C. Cir. 1981). The *ex officio* provision applies by its terms to all union members equally. UFCW Const. Art. 15(E) ("Each Local Union President shall be a delegate to the regular Convention by virtue of election to office. Where a Local Union is entitled to more than one delegate to the Convention, the Local Union Secretary-Treasurer shall be a delegate by virtue of election to office."). Because no union member is being privileged at the expense of another, the equal rights guarantee is not directly implicated.

17

*Cf. Grant v. Chicago Truck Drivers, Helpers & Warehouse Workers Union*, 806 F.2d 114, 117 (7th Cir. 1986).

Barry and Scott try to work around this.  They allege that "[t]he use of *ex officio* delegates also has a disparate impact on the equal right of members to vote and run for office," as smaller locals are disproportionately harmed by the rule.  Compl. ¶ 52.  The D.C. Circuit has never held that disparate impact claims are cognizable under Title I.  But it has noted that "a union cannot immunize itself against charges of discrimination simply by affording each member the mere naked right to cast a ballot; the right each member has to vote must be meaningful."  *Bunz v. Moving Picture Mach. Operators' Protective Union Loc. 224*, 567 F.2d 1117, 1121 (D.C. Cir. 1977) (cleaned up).  Thus "the equal right to vote may be denied upon the occurrence of serious discrimination, irregularities, or foul play at any stage of the electoral process."  *Id.* at 1122.

For instance, the right was denied when members were "misinformed about proposals." *Id.* at 1121, n.22 (internal citations omitted).  Also when "union officials refused to provide opponents access to a membership mailing list."  *Id.* at 1121.  Likewise the privilege was undermined "where irregularities occurred in counting ballots," and "where union officials refused to implement the result of a properly-conducted vote."  *Id.* at 1121–22.  So a facially discriminatory policy is not always necessary for a union member to show her right to an equal vote was violated.  But the member must demonstrate that there was some major interference with her ability to vote such that the right was rendered practically nugatory.

The *ex officio* delegate rule does not have this effect.  Sure, it reduces the amount of convention delegates a member can elect directly.  And that means members in smaller locals will be able to elect fewer delegates in siloed elections than members in larger locals.  But it is

18

not as if members in small unions are being represented by unaccountable autocrats.  The *ex officio* delegates are still elected by the members, just in elections that double as officer elections.  The voting structure in the smaller unions may look a little different.  But their right to vote has not been meddled with or obstructed in some nefarious or extreme way.  Nor has the union leadership failed to follow its own procedures.  Instead, the structure represents the well-settled freedom of unions to fashion rules of internal management and administration without meddling by the courts.  *Fish v. Huddell*, 51 F.2d 319, 320 (D.C. Cir. 1931).

Labor unions have significant latitude in how they set up and run their elections.  Courts are not authorized to "impose on labor unions whatever procedures or practices they regard as 'democratic.'"  *Carothers v. Presser*, 818 F.2d 926, 934 (D.C. Cir. 1987).  Under the law of this circuit, Plaintiffs' votes are meaningful.  The *ex officio* delegate claim therefore fails to state a claim for which relief can be granted.

**IV.**

 To sum up, the Court lacks subject matter jurisdiction over all of Barry and Scott's claims, save for their challenge to the *ex officio* delegate rule.  As for that provision, the Court finds that they have failed to state a claim for which relief can be granted.  The case must be dismissed.

A separate order will issue today.


Dated: November 4, 2024                                             TREVOR N. McFADDEN, U.S.D.J.