**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **KYONG BARRY, et al.**, <br><br> Plaintiffs, <br><br> v. <br><br> **UNITED FOOD AND COMMERCIAL WORKERS, et al.**, <br><br> Defendants. | Case No. 1:24-cv-01137 (TNM) |

## <u>MEMORANDUM OPINION</u>

The Labor-Management Reporting and Disclosure Act ("LMRDA") aims to ensure that unions are "democratically governed and responsive to the will of their members[]." *Finnegan v. Leu*, 456 U.S. 431, 436 (1982). Two United Food and Commercial Workers ("UFCW") members claim that their union is not living up to the Act's promises. Plaintiffs have many qualms with UFCW, but only one live claim. It challenges UFCW's formula for allocating how many delegates each local union may send to quinquennial conventions. The graduated proportionality formula, Plaintiffs say, dilutes the voting power of large local union members in a way that deprives them of the "equal rights . . . to vote" the LMRDA guarantees. 29 U.S.C. § 411(a)(1).

Cross-motions for summary judgment on that claim are now before the Court. Because UFCW's delegate apportionment formula does not infringe members' "equal" right to vote—or at least is a "reasonable" regulation of that right—the Court will grant UFCW's motion and deny Plaintiffs' motion.

## I.

In 1979, two unions combined to form UFCW.  Defs.' Stmt. Mat. Facts ("DSMF") ¶ 3, ECF No. 32-2; Pls.' Stmt. Mat. Facts ("PSMF") ¶ 1, ECF No. 33-2.  UFCW now represents more than a million workers throughout the United States and Canada.  DSMF ¶¶ 1, 5.  A complex governance structure manages labor affairs for those members.  An executive board oversees day-to-day matters, but UFCW's "highest governing authority" is the International Convention.  *Id.* ¶ 8; *see* Defs.' Ex. 1 ("2023 UFCW Const.") art. 14, ECF No. 32-4.  Every five years, delegates representing UFCW's 330 local affiliates convene to set policy and elect officers.  *See* DSMF ¶¶ 8, 11–12.

At issue here is UFCW's system for determining how many convention delegates each local can send.  Local unions run delegate elections through secret ballot votes.  *See* 2023 UFCW Const. art. 15(E), (F).[1]  But UFCW's constitution constrains how many delegates each local can send, allocating delegates based on the local's size.  *Id.* art. 15(B), (C).  UFCW's "graduated proportionality" system affords locals "additional delegates at membership thresholds of increasing intervals."  Defs.' Mot. for Summ. J. ("Defs.' Mot.") at 9, ECF No. 32-1 (citing DSMF ¶ 21); *see* 2023 UFCW Const. art. 15(B).  In practice, that means that as a local's membership increases, its delegate-per-member ratio decreases.  *See* 2023 UFCW Const. art. 15(B).  Some figures make that more concrete.  Since 1993, UFCW has used these bands:

---

[1]  A local's president automatically serves as a delegate.  2023 UFCW Const. art. 15(E).  So does the local's secretary if the local is entitled to at least 2 delegates.  *Id.*

| Number of Active Members in Local Union | Number of Delegates |
|---|---|
| 1 – 500 | 1 |
| 501 – 1,000 | 2 |
| 1,001 – 1,750 | 3 |
| 1,751 – 2,500 | 4 |
| 2,501 – 3,250 | 5 |
| 3,251 – 4,000 | 6 |
| 4,001 – 4,750 | 7 |
| 4,751 – 5,500 | 8 |
| 5,501 – 6,250 | 9 |
| 6,251 – 7,000 | 10 |
| 7,001 – 7,750 | 11 |
| 7,751 – 8,500 | 12 |
| 8,501 – 9,250 | 13 |
| 9,251 – 10,000 | 14 |
| 10,001 – 10,750 | 15 |
| 10,751 – 11,500 | 16 |
| 11,501 – 12,250 | 17 |
| 12,251 – 13,000 | 18 |
| 13,001 – 13,750 | 19 |
| 13,751 – 14,500 | 20 |
| 14,501 – 16,000 | 21 |
| 16,001– 18,000 | 22 |
| 18,001 – 21,000 | 23 |
| 21,001 – 24,000 | 24 |
| 24,001 – 29,000 | 25 |
| 29,001 – 34,000 | 26 |
| 34,001 – 39,000 | 27 |
| 39,001 – 44,000 | 28 |
| 44,001 – 49,000 | 29 |

*Id.*  Locals with more than 49,000 members receive another delegate for each additional 5,000 members.  *Id.*

Plaintiffs Kyong Barry and Iris Scott dislike how the apportionment formula treats members of large locals.  *See, e.g.*, Am. Compl. ¶¶ 17–34, ECF No. 25; Pls.' Mot. for Summ. J. at 6 ("Pls.' Mot."), ECF No. 33-1.  They primarily point to Local 3000—to which Barry belongs—as an example of the "[d]ramatically diminished voice" members of large locals experience under the graduated proportionality formula.  Am. Compl. at 5.  Local 3000 is one of the largest locals, with more than 50,000 members as of 2024.  Pls.' Ex. 8 at 40, ECF No., 33-13

3

(Local 3000's 2024 Annual Report showing "52,510" members in 2024).[2]  At that size, Local 3000 is entitled to 30 delegates.  *See* 2023 UFCW Const. art. 15(B).  The result?  One Local 3000 delegate representing more than 1,700 members.  Compare that to the 1:1 delegate to member ratio a local with one member could enjoy.  *See* Defs.' Ex. 10 ("2023 Delegate Apportionment Spreadsheet") at 9, ECF No. 32-13 (showing that Local 105 had 1 member and could send 1 delegate to the 2023 convention).  The formula's dilutive effect on the voting strength of large union members, Plaintiffs fear, is becoming stronger as the large unions grow larger.  *See, e.g.*, Am. Compl. ¶ 34.

To change things before the next convention in 2028, Barry and Scott sued UFCW, its president, and its treasurer.  Compl., ECF No. 1.  They originally brought five claims, each of which criticized a different aspect of the convention structure for violating the LMRDA's promise that "[e]very member of a labor organization shall have equal rights and privileges . . . to vote."  29 U.S.C. § 411(a)(1); *see* Compl. ¶¶ 46–63.  The Court dismissed these claims in November 2024.  *See Barry v. United Food & Com. Workers* ("*Barry I*"), 755 F. Supp. 3d 34, 50–51 (D.D.C. 2024).  Most faltered on jurisdictional grounds.  *Id.* at 47–48.  And Plaintiffs failed to state a claim for relief on the only claim over which jurisdiction existed.  *Id.* at 48–50.

Shortly after the dismissal, Plaintiffs sought leave to file an Amended Complaint.  *See* Mot., ECF No. 22.  Amendment was mostly futile.  Mem. Order at 2, ECF No. 24.  But Plaintiffs had one plausible claim—that "UFCW's method of nonproportional allocation of [Convention] delegates" to local unions "violates their guarantee to an equal vote under section 101(a)(1) of

---

[2] The parties quibble over Local 3000's exact size.  *See, e.g.*, Defs.' Resp. PSMF ¶¶ 7, 11, ECF No. 35-1; Defs.' Ex. 10 at 2, ECF No. 32-13 (showing that Local 3000 had 48,389 members and 29 delegates at the 2023 Convention).  This dispute is immaterial, so the Court uses Plaintiffs' figures for background.

[LMRDA.]" *Id.* at 2–3.  They cured the standing deficiencies that previously doomed the claim by plausibly alleging that UFCW's formula diluted Barry's voting power relative to small local members.  *Id.* at 3.  The Court did not address UFCW's premature challenges on the merits.  *Id.* at 3–4.

So the delegate apportionment claim alone proceeded to discovery.  *See id.* at 4.  Now, the parties cross move for summary judgment.  *See* Pls.' Mot., ECF No. 33-1; Defs.' Mot., ECF No. 32-1.  Those motions are ripe.

## II.

Summary judgment is appropriate if the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is material if it could alter the outcome of the suit under the substantive law, and genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The movant must "identify[] those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (cleaned up).  If it does so, the burden shifts to the nonmoving party to point to "specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 250 (cleaned up).  The nonmoving party's evidence "is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.  But the nonmoving party cannot "rest upon mere allegation or denials of [its] pleading."  *Id.* at 248 (cleaned up).

Local rules supplement Rule 56.  Every summary judgment motion must "be accompanied by a statement of material facts as to which the moving party contends there is no genuine issue," and that statement must "include references to the parts of the record relied on to

support the statement." LCvR 7(h)(1); *see* Standing Order ¶ 14(B)(i), ECF No. 5 (similar). The opposing party "must respond to each paragraph with a correspondingly numbered paragraph, indicating whether that paragraph is admitted or denied." Standing Order ¶ 14(B)(iv) (emphasis omitted); *see* LCvR 7(h)(1). Like the movant, the opposing party "must furnish precise citations to the portions of the record" relied upon. Standing Order ¶ 14(B)(ii) (emphasis omitted). And "[i]n determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted" by the opposing party. LCvR 7(h)(1).

Plaintiffs did not comply with the local rules. Their opposition to UFCW's factual statement does not contain correspondingly numbered paragraphs and addresses only nine of UFCW's 140 factual assertions. *See* Pls.' Resp. DSMF ¶¶ 1–8, ECF No. 33-3. Record cites are also scant. *See id.* And though Plaintiffs submitted their own factual statement, that document does not make up for the deficient opposition. *Cf. Jeffries v. Barr*, 965 F.3d 843, 860–61 (D.C. Cir. 2020) ("This Court is not in the habit of doing parties' lawyering for them, and we decline to take up that task now."). More, Plaintiffs did not respond to UFCW's statement of additional disputed facts. *See* Defs.' Resp. PSMF at 19–20, ECF No. 35-1. So the Court can, and will, treat most of UFCW's proposed facts as admitted. *See* LCvR 7(h)(1); Standing Order ¶ 14(B)(v); *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 154 (D.C. Cir. 1996) (holding that the "district court properly deemed as admitted the material facts set forth in the [defendant's] . . . statement of material facts not in dispute" when the plaintiff did not comply with procedural rules).

With those rules in mind, the Court addresses its jurisdiction, then considers the merits.

6

### III.

### A.

The Court has an "independent obligation to ensure [its] jurisdiction." *Muthana v. Pompeo*, 985 F.3d 893, 901 (D.C. Cir. 2021). Here, both subject matter jurisdiction and Article III standing require a word. In the end, though, Plaintiffs satisfy both requirements.

#### i.

Take subject matter jurisdiction first. Normally the analysis would be straightforward. Plaintiffs invoke a cause of action created by a federal statute—the LMRDA. *See* Am. Compl. ¶¶ 80, 82; 29 U.S.C. § 412. So 28 U.S.C. § 1331 should confer jurisdiction. *See Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 26 (2025). Precedent interpreting the LMRDA makes matters more complicated, though it does not ultimately withdraw jurisdiction.

The wrinkle starts with the interplay between Title I and Title IV of the LMRDA. The former is "the so-called Labor Bill of Rights." *Conille v. Council 93, Am. Fed'n of State, Cnty. & Mun. Emps.*, 973 F.3d 1, 8 (1st Cir. 2020) (cleaned up). It focuses on "equal treatment among union members," guaranteeing equal rights to vote, speak, and assemble. *Id.* When a union violates Title I, a member can sue the union in federal court for "appropriate" relief. 29 U.S.C. § 412. Title IV, meanwhile, focuses on union officer elections. *See id.* § 481. And it comes with an "exclusive" enforcement procedure "for challenging an election already conducted." *Id.* § 483; *see Loc. No. 82, Furn. & Piano Moving v. Crowley*, 467 U.S. 526, 540 (1984). To pursue a Title IV claim, a union member must file a complaint with the Secretary of Labor. 29 U.S.C. § 482. And only the Secretary can sue in court. *Crowley*, 467 U.S. at 540.

Despite their distinct focuses, "[t]he statutory rights contained within Title I and Title IV can sometimes seem to overlap." *Conille*, 973 F.3d at 9. While Title IV plainly bars, for

example, union members from seeking to unseat an elected official, the line between Title IV and Title I becomes "muddy" when a Title I claim implicates union elections. *Id.* One way to resolve the uncertainty would be to follow the statutory text. Title IV says it provides the exclusive path for "challenging an election already conducted." 29 U.S.C. § 483. That is arguably the sort of "sweeping and direct" language signaling a jurisdictional prerequisite. *Avocados Plus Inc. v. Veneman*, 370 F.3d 1243, 1248 (D.C. Cir. 2004). At the very least, it signals a mandatory claim-processing rule. *See Fort Bend Cnty. v. Davis*, 587 U.S. 541, 548 (2019) (distinguishing between jurisdictional requirements and claim-processing rules). Title I's private cause of action, however, includes no such language. *See* 29 U.S.C. § 412. Perhaps then Title IV funnels any claim "challenging an election already conducted" to the Secretary of Labor, *id.* § 483, and does not otherwise affect a union member's ability to sue in court over a Title I violation.

Whatever the merits of that approach, the Court does not write on a blank slate, and it must respect the line the Supreme Court laid down in *Crowley*. In that case, union members challenged an ongoing election, claiming that the union's rule restricting participation to "members who could produce computerized dues receipts" violated Title I. 467 U.S. at 530–31. The district court enjoined the election and "provided detailed procedures" for the union to follow in a new election. *Id.* at 533. Although the plaintiffs framed their claim as a Title I problem, the election-oriented relief seemed to encroach on Title IV's turf. *See id.* at 534. Relying on the LMDRA's legislative history and § 412's language permitting a court to award only "appropriate" relief in a Title I suit, the Court found that Title I could not support the relief ordered. *See id.* at 545–46. "[E]ven when Title I violations are properly alleged and proved," the Court held, "Congress would not have considered a court order requiring and judicially

8

supervising a new election to be" the sort of "appropriate" relief § 412 permits. *Id.* at 543 (cleaned up). And because the Court viewed § 412's cause of action as a "jurisdictional provision," *id.* at 538, it held that courts lack jurisdiction over Title I claims that require judicial supervision of an ongoing election, *see id.* at 546; *see also, e.g.*, *Conille*, 973 F.3d at 9–11 (recapping *Crowley*'s jurisdictional holding).

That holding is in some tension with the Supreme Court's recent warnings that courts should take a cautious approach to finding jurisdictional prerequisites without congressional say-so. *See, e.g.*, *Fort Bend Cnty.*, 587 U.S. at 547–50. For that reason, even UFCW favors treating Title IV's exclusivity provision as a non-jurisdictional constraint on Title I claims. *See* Defs.' Mot. at 41 n.6; Defs.' Reply at 36 n.17, ECF No. 35. But the Court need not reach that issue today.

Even under *Crowley*, the Court has jurisdiction over Plaintiffs' claim. To start, Plaintiffs claim "a violation of a specific right enunciated in [Title I]." *Bunz v. Moving Picture Mach. Operators' Protective Union Loc. 224*, 567 F.2d 1117, 1120 (D.C. Cir. 1977). They claim that the delegate apportionment formula violates the LMRDA's promise of "equal rights. . . to vote." 29 U.S.C. § 411(a)(1); *see* Am. Compl. ¶¶ 80, 82. True, that framing is not dispositive. Under *Crowley*, a claim framed as a Title I violation that requires Title IV relief cannot proceed. 467 U.S. at 543; *see Scott-Anderman v. Martinez*, 60 F.4th 680, 684 (D.C. Cir. 2023) ("[I]f the plaintiff disregards the procedures in Title IV and mounts only a Title I claim seeking to overturn an officer election, the court has no authority to grant relief.").

But remedies are not a problem here. It would not be "impossible" to remedy Plaintiffs' alleged harms without "invalidat[ing]" a past or ongoing officer election. *Scott-Anderman*, 60 F.4th at 684. Indeed, Plaintiffs disclaim any attempt to overturn past elections and seek only

prospective relief.  *See* Pls.' Mot. at 32–33; Am. Compl. at 18.  More, that prospective relief does not implicitly require a court to supervise a new union officer election.  Because delegates are not "officers" as defined by the LMRDA, their election does not fall within Title IV's scope.  *See* 29 U.S.C. § 402(n) (defining "officer"); Defs.' Reply at 37 (conceding that "delegates are not officers").  And though delegates do vote on officers at the quinquennial convention, *see* 2023 UFCW Const. arts. 15, 17(H), the Court could remedy any delegate apportionment defect well before the next convention two years from now.

In response, UFCW offers appellate court dicta to cast Plaintiffs' claim as one that requires pursuit through Title IV.  In *Conille*, the First Circuit considered a challenge to the way an intermediate union body—called Council 93—allocated executive board seats to local unions. 973 F.3d at 4–5.  Council 93's constitution divided locals into legislative districts and gave "a specific number of vice president positions to each legislative district." *Id.* at 5.  The allotment turned on historical compromises; it bore no relationship to district size. *Id.*  Plaintiffs complained that the lack of proportional representation deprived them of their right to an equal vote under Title I. *Id.* at 7.  In the end, the First Circuit found dispositive *Crowley*'s remedy test. *Id.* at 9.  The plaintiffs' suit was inappropriate because "the remedy sought and awarded by the district court . . . far exceeded what courts can do in Title I cases." *Id.* at 10.  Specifically, the plaintiffs' proposed remedy "effectively deprive[d] the prior election of its legitimacy and full effect" and "put[] the district court in the position of supervising a new election." *Id.*

*Conille* does not apply here.  For starters, the First Circuit resolved the case by applying *Crowley*'s remedial test.  *See id.*  And, again, that test does not require dismissal here.  To the extent that UFCW reads *Conille* as suggesting that any claim tangentially related to the way a union conducts elections must be pursued under Title IV, *see* Defs.' Mot. at 41, it overreads the

10

decision.  True, before applying *Crowley*'s remedial test, the First Circuit noted the difficulty of categorizing the substance of the claim at issue under Title I or Title IV.  *See Conille*, 973 F.3d at 9 (describing the wrongs at issue as "something of a hybrid" between Title I and Title IV problems).  The plaintiffs were "specific groups of members" who claimed that they were denied equal representation "à la Title I."  *Id.*  But "Title IV might be the better fit" for the claim because the plaintiffs set their sights on "the election structure," which "applies evenly to all past, present, and future elections."  *Id.*  From this latter quote, UFCW jumps to the proposition that Title IV bars any claim that attacks "generally applicable election rules."  Defs.' Mot. at 42 n.7.  Yet *Conille* explicitly did not resolve that question.  *See Conille*, 973 F.3d at 9.  And the Court is reluctant to further complicate matters.

In any event, the *Conille* claim was closer to Title IV's heartland than Plaintiffs' claim here.  The *Conille* plaintiffs took aim at their allotted number of intermediate officer positions. *See id.* at 5.  Title IV explicitly covers intermediate officer elections.  *See* 29 U.S.C. § 481(d). Plaintiffs here have similar representational qualms, but they set their sights on delegate rather than officer allotment.  *See, e.g.*, Am. Compl. ¶ 84.  And Title IV does not govern *delegate* elections.  *Cf.* Defs.' Reply at 37 (conceding that "delegates are not officers").  Instead, Title IV's prescriptions come into play only when the delegates themselves vote on international officers.  *See* 29 U.S.C. § 481(a) (requiring an "international labor organization" to "elect its officers not less often than once every five years either by secret ballot . . . or at a convention of delegates chosen by secret ballot"); 2023 UFCW Const. arts. 14, 15 (authorizing delegates to elect officers as part of their duties at the convention).  Otherwise, Title IV contemplates that the delegate convention "shall be conducted in accordance with the constitution and bylaws of the labor organization."  29 U.S.C. § 481(f).  The issue here is whether those procedures include

11

voting rights that discriminate against some members. And that is a Title I matter. *Cf. Am. Postal Workers Union, AFL-CIO, Hqs. Loc. 6885 v. Am. Postal Workers Union, AFL-CIO* ("*APWU*"), 665 F.2d 1096, 1101–02 (D.C. Cir. 1981) (reviewing, albeit without addressing jurisdiction, a Title I claim that a union's constitution discriminated against members' voting rights).

Because the vote dilution claim invokes Title I's protections and because the Court could remedy any shortcoming without interfering with elections governed by Title IV, the Court has subject matter jurisdiction.

**ii.**

Jurisdiction is also appropriate because at least Barry has Article III standing to press the vote dilution claim. *See Nat'l Sec. Archive v. CIA*, 104 F.4th 267, 271 (D.C. Cir. 2024) ("Article III standing is a prerequisite to federal court jurisdiction." (cleaned up)). To establish this "irreducible constitutional minimum," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), a plaintiff must establish that he "has suffered or likely will suffer an injury in fact"; "that the injury likely was caused or will be caused by the defendant"; and "that the injury likely would be redressed by the requested judicial relief," *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024).

As this Court already explained, Barry met these requirements based on her Amended Complaint's allegations. *See* Mem. Order at 2–4; *see also Barry I*, 755 F. Supp. 3d at 44–47 (finding standing deficiencies based on an earlier complaint). Summary judgment evidence backs up that standing finding. *See Cal. Cattlemen's Assoc. v. U.S. Fish & Wildlife Ser.,* 369 F. Supp. 3d 141, 145 (D.D.C. 2019) (explaining that a plaintiff's standing burden rises at the summary judgment stage); *see also, e.g.*, PSMF ¶¶ 24, 26–27, 41. In making that conclusion, the

Court assumes as it must, that [Barry] will prevail on the merits" of her claim. *Comm. on Judiciary of U.S. House of Reps. v. McGahn*, 968 F.3d 755, 762 (D.C. Cir. 2020) (en banc). Because Barry has standing, the Court need not consider whether Scott has standing to bring the same claim. *See Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 8 (D.C. Cir. 2017).

**B.**

Finally, the merits. Recall Plaintiffs' claim is that UFCW's delegate allocation system violates Title I because members of large locals, like Barry, have less voting power than members of small locals. The relevant provision, § 101 of the LMDRA, provides:

> "*Every member of a labor organization shall have equal rights and privileges within such organization* to nominate candidates, *to vote in elections or referendums of the labor organization*, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, *subject to reasonable rules and regulations in such organization's constitution and bylaws*."

29 U.S.C. § 411(a)(1) (emphasis added). UFCW "is a labor organization." Defs.' Mot. at 8; *see* DSMF ¶ 2. And Barry is a UFCW member. Defs.' Resp. PSMF ¶ 24. That leaves two questions. *First*, does UFCW's delegate apportionment formula deny Barry equal rights to vote in elections? *Second*, if so, is the formula an unreasonable rule or regulation? To prevail, Plaintiffs must provide evidence that answers each question in the affirmative. They fail on both fronts. Because the formula does not deny Barry an equal vote and, would be reasonable even if it did, UFCW earns summary judgment.

**i.**

Plaintiffs' claim founders because the delegate formula does not violate the LMDRA's promise of "equal rights and privileges . . . to vote in elections or referendums of the labor organization." 29 U.S.C. § 411(a)(1). This provision creates no substantive voting rights. *APWU*, 665 F.2d at 1101. It instead "mandate[s] that rights given to some members be available

to all." *Id.* In other words, it forbids discrimination. *See Calhoon v. Harvey*, 379 U.S. 134, 139 (1964). A union, then, can deny all members the right to vote so long as it does so for everyone. *See APWU*, 665 F.2d at 1101.

The delegate structure comports with this requirement. Recall that the delegate structure involves two votes. First, local union members vote on delegates from their ranks. *See* 2023 UFCW Const. art. 15(E), (F); DSMF ¶ 15. The locals carrying out those elections must afford equal voting rights to local members. *See* 2023 UFCW Const. arts. 15(G), 35; DSMF ¶ 13 (explaining that local unions—like Barry's Local 3000—are "labor organizations" subject to 29 U.S.C. § 411(a)(1)). Second, the delegates themselves go on to vote at the convention on officer elections and other business. *See* DSMF ¶ 11 (citing 2023 UFCW Const. arts. 14–15). Teasing out the two levels of votes shows that Barry's rights could be abridged only if she lacks an equal right to vote on delegates relative to other Local 3000 members or if she lacks an equal right to vote at the convention relative to other UFCW members. The evidence shows neither is true.

Start with the delegate elections. Barry does not seem to criticize this process. The first clue on that front is that she did not sue Local 3000—the entity responsible for overseeing the delegate elections she voted in—alongside UFCW. *See* Am. Compl. ¶¶ 7–9; DSMF ¶ 133. That is telling because Local 3000 is an "autonomous entity" that, again, must provide equal voting rights to its own members. DSMF ¶ 13; *see* Defs.' Mot. at 24–25. Even more telling is Barry's failure to dispute UFCW's evidence that "[e]ach member in good standing of a UFCW local affiliate has an equal opportunity to vote in elections for his or her local's delegates to the UFCW Convention." DSMF ¶ 16; *see id.* ¶ 17 (similar); *cf.* Pls.' Resp. DSMF ¶ 1 (purporting to "demur[]" to some of UFCW's factual statements). Nor has she put forward her own evidence that Local 3000 limits her delegate voting rights relative to other Local 3000 members. So there

14

is no genuine dispute that Barry has "equal rights and privileges" to vote in Local 3000 elections. 29 U.S.C. § 411(a)(1).

As for convention voting, there too Barry has equal voting rights relative to other UFCW members. The key here is that rank-and-file UFCW members have no voting rights at all. *See* Defs.' Mot. at 24–26. Only *delegates* have the right to vote at the convention. *See* 2023 UFCW Const. art. 16(J).[3] To be sure, delegates themselves are typically UFCW members. *See* DSMF ¶¶ 11, 132–33, 136. But they have the right to vote only as delegates representing local unions, not in their capacity as members. *See* 2023 UFCW Const. arts. 15, 16(J). Under this arrangement, then, no UFCW member has a right to vote at the convention. *See* Defs.' Mot. at 24–26. Because that denial applies across the board, all UFCW members have equal rights.

Plaintiffs' responses proceed on the unstated premise that the two levels of voting can be collapsed. Rather than focusing on Barry's vote within Local 3000 relative to other local members or the relative weight of delegate votes at the convention, Plaintiffs compare Barry's relative voting strength at the convention through Local 3000's delegates to the voting strength of other locals' members through their delegates. *See, e.g.*, Pls.' Mot. at 14, 18. To the extent this boils down to an argument that rank-and-file members have a right to vote at the convention because they elect delegates, that is wrong. Under UFCW's constitution delegates represent locals, not individual members. *See* 2023 UFCW Const. art. 15; Defs.' Mot. at 24–26.

Sweeping that fact aside does not save Plaintiffs' position that "voter dilution" is a per se "violation of the equal right to vote." Pls.' Mot. at 13. Among other problems, Plaintiffs blend the inquiries into whether there are unequal voting rights with the ancillary question of whether

---

[3] Barry served as a delegate at the last convention, and it is undisputed that she "faced no impediment to her ability to serve as a delegate." DSMF ¶ 133.

such inequality is nevertheless permitted as a reasonable rule or regulation. *See id.*; *cf. APWU*, 665 F.2d at 1102 (distinguishing between these two inquiries). Putting aside for now the reasonableness inquiry, *see infra* Part III.B.ii, Plaintiffs offer no theory for determining when voter dilution amounts to a deprivation of the equal right to vote.

One possibility is that rank-and-file members must always have direct voting rights in international union elections. Indeed, given that some locals have only one member—and thus can send one delegate—this seems to be the inevitable result of Plaintiffs' inequality argument. *See* 2023 Delegate Apportionment Spreadsheet at 9. But no law justifies that rule. It cannot come from Title I. As Plaintiffs concede, § 101(a)(1)'s "equal rights" guarantee does not create any substantive rights. *See* Pls.' Reply at 6, ECF No. 38. Nor do Plaintiffs identify any other candidate. UFCW, meanwhile, shows that Congress declined to impose direct voting for international union delegate elections even as it imposed such a requirement for other elections. Defs.' Mot. at 26–27; *see* 29 U.S.C. § 481(b), (e). The absence of a direct vote requirement for international unions, then, suggests none exists. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*, 107–11 (2012) (discussing the "negative-implication canon").

Another possibility is that § 101(a)(1) requires directly proportional representation. *See* Am. Compl. ¶¶ 17, 19. To preserve a member's "equal vote," perhaps each delegate must represent the same number of local members. *Cf. Rucho v. Common Cause*, 588 U.S. 684, 709 (2019) (explaining that in constitutional "one-person, one-vote cases" the term "vote dilution" refers to the idea that "each representative must be accountable to (approximately) the same number of constituents"). But every court to consider the argument that § 101(a)(1) demands proportional representation has apparently rejected it. *See, e.g.*, *Fritsch v. Dist. Council No. 9*

16

*Bhd. of Painters, Decorators & Paper Hangers of Am.*, 493 F.2d 1061, 1063 (2d Cir. 1974) (rejecting the argument that Title I requires a "one-man-one-vote" rule and reasoning that any claim about relative vote weight should be brought under Title IV, if at all).[4]  Seeing the writing on the wall, Plaintiffs now disavow this argument too.  Pls.' Mot. at 11.  That leaves their naked protest of unfairness.  *See id.* at 15.

Without any explanation for when voter dilution violates the equal right to vote, Plaintiffs' lead case fizzles.  In *APWU*, the D.C. Circuit rejected a union's double standard.  The American Postal Workers Union (APWU) was a parent union that included various local unions representing a variety of Postal Service employees.  *See* 665 F.2d at 1098.  APWU interpreted its constitution to give only members of some local unions—those representing "mail processors"—the right to ratify collective bargaining agreements affecting them.  *Id.* at 1099.  Non-mail processing locals, APWU maintained, had no such right.  *Id.*

That disparity violated Title I.  Section 101(a)(1) guaranteed APWU members the equal right to vote in "referendums," which included "ratification votes on collective bargaining agreements."  *Id.* at 1101 n.12.  APWU violated that requirement by "creat[ing] two classes of members, only one of which [was] entitled to ratify its collective bargaining agreements."  *Id.* at 1102.  Non-mail processing unions were "a permanent special class of membership not entitled to an equal vote."  *Id.* (cleaned up).  The Circuit then held that the distinction could not be justified under Title I's "reasonable rules and regulations" carve out.  *See id.* at 1102–05.

---

[4]  Other courts have rejected similar challenges under § 101(a)(1)'s carve out for "reasonable rules and regulations" that deprive members of the equal right to vote.  *See infra* Part III.B.ii. The preliminary inquiry into whether the formula denies members "equal rights" appears to be the more natural textual hook for their analysis.  But under either clause, Plaintiffs' claim fails.

*APWU* is inapposite because Barry has not been denied voting rights.  It was undisputed in *APWU* that the plaintiffs—a local and its non-mail processing members—lacked a voting right that others had.  *See id.* at 1099, 1102.  Not so here.  Again, Barry can vote for delegates in Local 3000 elections.  *See* DSMF ¶¶ 16–17.  And Local 3000's delegates can vote on officer elections and other business at the convention.  *See, e.g.*, *id.* ¶¶ 8, 11.  Plaintiffs identify no voting right other UFCW members possess that Barry lacks.  That is fatal to Plaintiffs' claim.

**ii.**

More, even if the delegate allocation formula deprived Barry of "equal rights" to vote, that formula would still be valid.  Title I protects a union member's "equal rights" to vote "subject to reasonable rules and regulations in [the union's] constitution and bylaws."  29 U.S.C. § 411(a)(1).  The reasonableness clause is an independent hurdle a union member must clear. *See APWU*, 665 F.2d at 1102.  Plaintiffs have not done so.  Because the delegate allocation formula is reasonable, Plaintiffs' claim fails twice over.

*APWU* teaches that a union rule based on "mechanical adherence to prior practice with no rational policy justification" is not a "reasonable rule or regulation."  *Id.* at 1103.  Otherwise, Circuit precedent offers little guidance on the reasonableness clause.  So the Court follows the parties' lead by applying the Seventh Circuit's test, looking at the "balance between the anti-democratic effects of the challenged rule and the union interests urged in its support."  *McGinnis v. Loc. Union 710, Int'l Bhd. of Teamsters*, 774 F.2d 196, 200 (7th Cir. 1985) (cleaned up) (attributing this test to *Alvey v. Gen. Elec. Co.*, 622 F.2d 1279, 1285 (7th Cir. 1980)); *see* Pls.' Mot. at 21 (encouraging the Court to follow *Alvey*); Defs.' Mot. at 34 (directing the Court to *McGinnis*).  Further, "[r]easonableness here must also be interpreted in light of the general policy against judicial interference in the internal affairs of unions."  *McGinnis*, 774 F.2d at 200; *see*

*Theodus v. McLaughlin*, 852 F.2d 1380, 1386 (D.C. Cir. 1988) (endorsing this policy in a different sort of LMRDA suit).

Under these principles, UFCW's delegate apportionment formula is a "reasonable" regulation of members' voting rights. *First*, consider its effects. Recall that the graduated proportionality formula allocates delegates to locals based on membership with incrementally fewer delegates per member as union membership increases. *See, e.g.*, DSMF ¶ 21; 2023 UFCW Const. art. 15. To show "anti-democratic" effect, Plaintiffs compare the delegate-to-member ratio for the largest unions relative to the smallest unions. *See, e.g.*, Pls.' Mot. at 7–8; PSMF ¶¶ 12, 13; Pls.' Reply at 10. They say, for example, "that all the members in small locals, of under 500 members, number less than half of the members of Local 3000 but are given over 7 times the voting strength of Local 3000's members on the Convention floor." Pls.' Mot. at 8.

Those abstract calculations hide the full story. To start, UFCW rightly criticizes Plaintiffs for offering statistics without explaining the calculations on which they rest. *See, e.g.*, PSMF ¶¶ 12, 13; Defs.' Resp. PSMF ¶ 13; Defs.' Reply at 24. More, the calculations ignore the practical realities that prevent small unions from realizing the greater proportional representation they could have. *See, e.g.*, DSMF ¶ 56 (explaining that smaller unions have difficulty fielding delegates because their leaders have full-time jobs); Pls.' Ex. 5 ("Perrone Dep.") at 20:16–21:3, ECF No. 33-10 (same). Ample undisputed record evidence shows that the small unions to which Plaintiffs compare Barry's voting strength often send no delegates to the convention. For example, Plaintiffs do not dispute that more than two thirds "of local affiliates with 1,000 or fewer members sent *zero* delegates to the 2023 UFCW Convention." Defs.' Resp. PSMF ¶ 12; *see id.* ¶ 141; DSMF ¶ 56. Barry's local, meanwhile, sent every delegate it could to the last convention. 2023 Delegate Apportionment Spreadsheet at 2. Nor is there any reason to think

that these trends would change at future conventions.  In short, though the graduated proportionality formula does theoretically afford larger unions like Barry's fewer delegates per member than small unions, the evidence belies Plaintiffs' claims about the extent of that disparity.

*Second*, balance those effects against UFCW's reasons for the apportionment formula. The graduated proportionality formula traces back to UFCW's founding in 1979.  DSMF ¶ 21.  It was part of a compromise between the unions that merged to create UFCW.  Hipolito Decl. ¶ 11, ECF No. 32-39.[5]  That history, of course, would not justify unthinking retention of the formula. *See APWU*, 665 F.3d at 1103.  But that is not the case here.  Instead, the record shows that UFCW has reconsidered and decided to maintain (with some tweaks) the graduated proportionality formula out of cost concerns and satisfaction with how it accommodated the size disparity between locals.

Start with cost concerns.  Undisputed evidence paints the delegate allocation formula as a way to keep convention costs down.  *See, e.g.*, Perrone Dep. at 25:2–9; Pls.' Ex. 11 ("Saleeby Email") at 2, ECF No. 33-16.  In 1993, the convention amended the formula in a way that "reduce[d] the number of delegates Local Unions are entitled to, due to financial considerations." Defs.' Ex. 22 ("1993 Convention Constitution Committee Report") at 5, ECF No. 32-25.  And before the most recent convention, UFCW staff decided against recommending changes to the formula because of cost concerns.  *See, e.g.*, Saleeby Email at 2; Perrone Dep. at 25:2–9.  A more directly proportional allocation system would increase the number of delegates, thereby

---

[5]  To the extent Plaintiffs argue that the formula is invalid because it was adopted for discriminatory purposes, the record does not back that up. *See, e.g.*, Defs.' Ex. 11 ("Barry Dep.") at 50:6–8, ECF No. 32-14 (Barry's testimony that she has no evidence showing the delegate allocation formula was adopted for discriminatory reasons); DSMF ¶ 27 (Defendants' uncontested statement that there is no evidence of discrimination in the record).

increasing convention space and delegate lodging budgets. *See* DSMF ¶¶ 52–53 (explaining that UFCW pays for these convention costs).

The cost concerns alone justify the formula, but add to the budget constraints evidence that UFCW believes the formula works well in practice. Former UFCW President Marc Perrone explained, for example, that the formula "balances the equities between the large locals and the small locals." Perrone Dep. at 27:13–15. By giving larger locals fewer additional delegates as membership rises, the formula counteracts the existing incentives that favor large locals. Large locals, for example, "have quite a bit of influence" on the executive board. *Id.* at 27:16–21. And, again, they are better able to field convention delegates. *E.g.*, *id.* at 20:16–21:3; Defs.' Resp. PSMF ¶ 12.

Rather than trying to dispute most of this evidence about UFCW's reasons for graduated proportionality, Plaintiffs demand that UFCW disprove the workability of their preferred alternative. They argue that weighting delegate votes by the number of local members would allow for directly proportional representation without increasing the number of delegates. Pls.' Mot. at 26. Weighted voting may well be preferable. Several peer unions use it in some way. *See, e.g.*, PSMF ¶¶ 32, 34, 36. And caselaw confirms Title I permits weighted voting. *Am. Fed'n of Musicians v. Wittstein*, 379 U.S. 171, 182 (1964). That weighted voting is an option available to UFCW, though, does not require its adoption.

More, Plaintiffs get things backwards by insisting that UFCW needs to explain why weighted voting would not work. *See* Pls.' Mot. at 26–27. Section 101(a)(1) blesses "*reasonable* rules and regulations" that burden the equal right to vote. 29 U.S.C. § 411(a)(1) (emphasis added). It does not require the least restrictive means possible. *Cf. APWU*, 665 F.2d at 1103, 1104 (rejecting as unreasonable a voting restriction that lacked a "reasonable rationale"

or a "rational policy justification").  When confronted with a similar demand that a union justify its rule under another Title I provision requiring reasonableness, the D.C. Circuit rejected the argument.  *See Quigley v. Giblin*, 569 F.3d 449, 456 (D.C. Cir. 2009) ("Section 101(a)(2) does not impose an evidentiary burden but requires only that a union rule be 'reasonable.'").  The Circuit added that "a union rule need not perfectly achieve its intended purpose" to be "reasonable." *Id.* at 457.  *Quigley*, true enough, involved a different Title I provision.  *See* Pls.' Reply at 7–9.  But the court's analysis of the neighboring provision focused on the same word— "reasonable"—at issue here.  *Quigley*, 569 F.3d at 456.  The Court sees no reason to ignore the Circuit's reasoning.

Finally, the dearth of precedent supporting Plaintiffs only tips the scales further in UFCW's favor.  Plaintiffs are not the first union members to ask a court to require a union to adjust the degree of representation a union provides in elections.  Courts rejected those claims. Defs.' Mot. at 34–35; *see, e.g.*, *Denov v. Chi. Fed'n of Musicians, Loc. 10-208*, 703 F.2d 1034, 1041 (7th Cir. 1983) ("Congress did not require a one-member, one-vote system of representation"); *Gordon v. Laborers' Int'l Union of N. Am.*, 490 F.2d 133, 137–38 (10th Cir. 1973) (Title I "was not intended to impose a proportional representation system on international unions or their intermediate bodies").  Plaintiffs try to sideline these cases with factual distinctions but point to no comparable case that comes out their way.  *See, e.g.*, Pls.' Mot. at 17– 18.  That lack of support is telling, particularly considering the "policy against judicial interference" in union affairs.  *McGinnis*, 774 F.2d at 200.

Taken together, these considerations show that there is no genuine dispute of material fact on the reasonableness of UFCW's formula.  UFCW allocates delegates based on graduated

22

proportionality because it serves the union's interests of keeping costs down and practically balancing the interests of its locals.

## IV.

In the end, although the voter dilution claim is capable of resolution in this Court, it cannot survive summary judgment. UFCW's delegate structure does not offend Title I's "equal rights" guarantee and even if it did, it would be permissible as a "reasonable rule or regulation" of member voting rights. *See* 29 U.S.C. § 411(a)(1). Plaintiffs' arguments to the contrary, at bottom, devolve into protests of unfairness. Even Title I's "exhaustive Bill of Rights," *Crowley*, 467 U.S. at 536 (cleaned up), does not stretch so far as to allow a Court to micromanage how a union has structured its affairs at the behest of two members. UFCW's democratic channels provide the appropriate forum for Barry and Scott's concerns.

For all these reasons, the Court will deny Plaintiffs' summary judgment motion and grant Defendants' summary judgment motion. A separate Order will follow.

Dated: May 21, 2026

TREVOR N. McFADDEN, U.S.D.J.